# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ASSET PLANNING SERVICES, LTD.,** | : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **NO. 21-2021** |
| v. | : | |
| | : | |
| **MICHAEL HALVORSEN, *et al.*,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM

**TUCKER, J.**                                                                 **April 13, 2022**

Before the Court is Defendants Michael Halvorsen and MRK Wealth Advisors, LLC's ("Halvorsen," "MRK," or collectively "Defendants") Motion to Dismiss (ECF No. 9), Plaintiff Asset Planning Services, LTD's ("APS" or "Plaintiff") Response in Opposition (ECF No. 14), and Defendants' Reply Brief (ECF No. 20). Upon careful consideration of the Parties' submissions, and for the reasons outlined below, Defendants' Motion is **GRANTED IN PART and DENIED IN PART**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[1]

### a.   APS and Halvorsen's Signed Agreements

Plaintiff APS, founded in 1987, is an independent wealth management company that offers its clients financial guidance, including financial planning, investment planning, tax planning, estate planning, employee benefits, and risk management. Pl.'s Compl. at ¶ 1. Plaintiff employs multiple professional advisory staff, paraplanners and operations support persons that serve nearly three hundred client households across more than twenty states. *Id*. Since its

---

[1] This section draws primarily from Plaintiffs' Complaint ("Pl.'s Compl."), Defendants' Brief ("Defs.' Br.") and Plaintiff's Response Brief ("Pls.' Br.").

founding, APS has developed an expertise in serving clients in the pharmaceutical sector, specifically, Merck retirees, by developing, creating, and utilizing proprietary software. *Id*. at ¶¶ 6-7.

APS' business involves confidential, proprietary, and trade secrets which it has taken extensive steps to protect. Pl.'s Compl. at ¶¶ 8-9. Some of these steps include, but are not limited to: (1) requiring employees to sign Non-Disclosure and Confidentiality Agreements; (2) training them on information security risks and responsibilities; (3) requiring all employees to train and acknowledge multiple policies aimed at protecting confidential, proprietary and  trade secret information; (4) introducing and incorporating a myriad of technology security measures; (5) maintaining various physical security protocols; and (6) conducting periodic risk assessments to identify cybersecurity threats and vulnerabilities. *Id*. at ¶ 9.

In 1997, APS hired Defendant Halvorsen as a Financial Place Case Writer and Financial Education Workshop Marketer/Instructor. Pl.'s Compl. at ¶ 10. Halvorsen worked his way up through the company, finally securing the position of Vice President of Corporate Advisory Services. *Id*. at ¶ 13. He would later become a shareholder in 2006. *Id*. With this status, Halvorsen obtained 10,750 shares of APS stocks, which constituted 10.75% of the company's outstanding shares. *Id*. at ¶ 14.

During and throughout his employment, Halvorsen signed multiple contracts with APS, many at his own encouragement and creation. Pl.'s Compl. at ¶¶ 16-21. One such agreement was an Employment Agreement, signed in 2014, that contained three distinct provisions: (1) a non-disclosure provision; (2) a non-solicitation provision; and finally (3) a non-competition clause. *Id*. at ¶¶ 20-23.

The Employment Agreement's non-disclosure provision stated:

> Employee recognizes and acknowledges that the following are valuable, special[,] and unique assets of APS's business:
>
>> (a) all of the information set forth in the opening paragraphs of this Agreement, specifically subparagraphs (a) through (g); and
>>
>> (b) any other information not generally known, concerning APS or its operations, clients, personnel or business, acquired disclosed, or made known to Employee while in the employ of APS, which, if used, or disclosed, could, with reasonable possibility, materially and adversely affect the business of APS, or accord to a competitor of APS a material competitive advantage.
>
> Employee recognizes and confirms that all of the foregoing information, in whatever forms it exists, is and will remain the sole property of APS. Employee will not, during or after the term of his/her employment use for his/her own benefit, or, including but not limited to, selling any other types of services whether competing or non-competing to any client whatsoever without the prior consent of any officer of APS, disclose to any person (other than in the ordinary conduct of APS's business) any of the foregoing information or any private material submitted to APS by any client, supplier[,] or co-venturer.

Pl.'s Compl., Ex. A., Halvorsen's 2014 Employment Agreement, § 1.

The non-solicitation provision stated:

> Employee acknowledges that APS owns full right and title to any and all client names, lists, etc[.] . . . Employee shall not solicit clients, either directly or through their new employer, for purposes of selling any other types of services whether competing or noncompeting to any client whatsoever. If a client queries an employee regarding any other types of services whether competing or non-competing, Employee is prohibited from establishing a business relationship without prior written consent of APS.

*Id*. at § 4. Finally, the non-compete clause stated:

> Employee will not, during his/her employment and for a period of two years after termination of his/her employment:

3

a) Sell, lease or furnish, offer to sell, lease or furnish, or assist in the sale, lease or furnishing or use of any services to any client or prospective client of APS, wherever located. Further, during such period, Employee will not assist any such client or prospective client to use any such service;

b) Directly or indirectly induce or attempt to influence any employee of APS to terminate his/her employment with APS, or employ, establish any business relationship with, do any business with or cause or encourage anyone else to associate with, employ or establish any business relationship with, or do any business with any employee who was employed by APS at the time of the termination of Employee's employment or who terminated his/her employment for any reason during the six (6) months preceding the termination of Employee's employment with APS; and

c) Engage in (whether as a principal, partner, director, officer, agent, employee, consultant, independent contractor or otherwise) or be financially interested in any business which is involved in business activities which are the same as or in competition with business activities carried on by APS, or being definitely planned by APS, at the time of the termination of Employee's employment. For purposes of this agreement, APS business activities include providing financial planning, tax planning and preparation, and investment advisory services to Merck & Co. Employees (including successors), providing 401(k) consulting to plan sponsors and providing employee benefit and financial planning workshops to employers for the benefit of their employees.

d) If the period of time or the area specified in section (c) above should be adjudged unreasonable in any proceeding, then the period of time shall be reduced by such number of months or the area shall be reduced by the elimination of such portion thereof or both so that such restrictions may be enforced in such area and for such time as is adjudged to be reasonable.

4

*Id*. at § 5.

Four years after Halvorsen executed the Employment Agreement, he executed a Confidentiality Agreement. Pl.'s Compl. at ¶ 24. This agreement was designed to "protect the Company's legitimate interests in its client relationships, and the confidential information that the Company has developed about its clients, operations, markets, and services" in consideration of his "continued employment/association with the Company." *Id*., Ex. B., Halvorsen's 2018 Confidentiality Agreement at ¶ 1.

### b.  Halvorsen's Departure and MRK's Creation

Plaintiff pleads Defendant Halvorsen began to "lay the groundwork" to compete with APS in 2019. On April 1, 2019, while still working with APS, Halvorsen purchased an office building in Doylestown, Pennsylvania which would subsequently be Defendant MRK's headquarters. Pl.'s Compl. at ¶ 39. That same year, Halvorsen hired Marie Krout, a paralegal, to work as MRK's financial paraplanner. *Id*. Krout enrolled in a financial paraplanner course in 2019 and completed it on January 2020, well before Halvorsen left APS. *Id*. On July 6, 2020, Halvorsen registered the corporate entity for MRK with the Pennsylvania Bureau of Corporations.[2] *Id*.

On October 16, 2020, more than three months after forming MRK, Halvorsen resigned from his post as Senior Vice President. Pl.'s Compl. at ¶¶ 45-46. Plaintiff alleges that Halvorsen misappropriated APS's confidential, proprietary, and trade secret information on behalf of MRK. *Id*. at ¶ 43. These trade secrets included, but not limited to, APS's: (1) client lists (including information about client needs and preferences); (2) software, which was developed and

---

[2] Plaintiff alleges that because Merck's stock trading symbol is MRK, Defendant's use of "MRK" in its business name is a clear indication that Defendant intended to compete with APS for current and future Merck employees. Pl.'s Compl. at ¶ 41.

perfected over 25 years and allows APS to provide "best-in-class" service to its clients; and (3) curated compilation of the benefits available to Merck employees and retirees[3]. *Id.*

### c.   Halvorsen's Harm to APS

Plaintiff alleges that after Defendant resigned, Halvorsen and MRK continued to utilize APS' trade secrets to solicit its clients and compete with it. Pl.'s Compl. at ¶ 47. Within the first three weeks following Halvorsen's resignation, Defendants were able to solicit APS clients, transferring $145 million of client assets and $996,000 of annualized client fees. *Id.* Plaintiff pleads that Defendants have also attempted to leverage the goodwill that exists between APS clients and business partners. *Id.* at ¶ 48.

### d.   Claims and the Present Motion to Dismiss

On April 30, 2021, Plaintiff filed its Complaint bringing nine[4] total claims, breaking them down by claims against Halvorsen, claim against MRK, and claims against both. Claims against Halvorsen included: breach of the employment agreement; breach of the confidentiality agreement; promissory estoppel; breach of fiduciary duty; and tortious interference with contractual relations, with Bates' Agreements[5]. Pl.'s Compl. at ¶¶ 66-95. Plaintiff's claim against MRK for tortious interference with contractual relations in regard to Halvorsen's Agreements. *Id.* at ¶ 96-103. Finally, Plaintiff's claims against both Defendants are tortious interference with contractual relations of APS' clients; misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836-1839; and misappropriation of trade secrets in

---

[3] The Complaint pleads the curated compilation was in a binder that contained documents which went missing around the same time Halvorsen resigned from APS. Pl.'s Compl. at ¶ 43.

[4] Plaintiff's Complaint pleads there are ten counts. However, upon closer examination, Count Nine is misnumbered as ten; thus, there are only nine claims.

[5] Plaintiff's Complaint pleads facts that are not all relevant to the present motion; thus, for brevity, this Court will not recite them at this time.

violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 PA C.S.A. §§ 5301-5308. Pl.'s Compl. at ¶¶ 104-127.

Defendants now bring the current Motion to Dismiss asserting four arguments. Defs.' Br. at 3-4. First, they contend that breach of the employment agreement, promissory estoppel, and breach of fiduciary duty should be dismissed because the restrictive covenants in the agreements are not supported by separate valuable consideration. *Id*. at 3. Second, Defendants assert that even if this Court were to find that adequate consideration existed, then the claims should still fail because the non-solicitation provision is unconstitutionally overbroad. *Id*.

Third, Defendants argue that breach of the confidentiality agreement, misappropriation of trade secrets in violation of DTSA and PUTSA should be dismissed because they are insufficiently plead. Defs.' Br. at 4. They contend APS has failed to identify a single item of confidential information that was misappropriated. *Id*. Finally, Defendants assert that MRK has previously been sued by the same Plaintiff in state court and, by operation of law, all of APS' claims asserted against MRK have been waived. *Id*.

Without reaching or addressing the overbreadth argument, this Court dismisses Plaintiff's claims for breach of the employment agreement, promissory estoppel, and breach of fiduciary duty because the restrictive covenants lacked new and valuable consideration. However, this Court finds claims for breach of the confidentiality agreement, misappropriation of trade secrets in violation of DTSA and PUTSA are sufficiently plead to survive the motion at this time and proceed to discovery. Moreover, Plaintiff's claims for tortious interference with contractual relation and misappropriation of trade secrets under PUTSA are not waived. Thus, Defendants' Motion to Dismiss is **GRANTED IN PART and DENIED IN PART.**

## II.      STANDARD OF REVIEW

A Rule 12(b)(6) Motion to Dismiss seeks to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). The touchstone of that pleading standard is plausibility. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and quotations omitted). Facial plausibility requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* A plaintiff will not prevail if he provides only "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). Instead, the plaintiff must detail "enough facts to raise a reasonable expectation that discovery will reveal evidence of 'each necessary element of the claims alleged in the complaint.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556 (2007)).

The Third Circuit set forth a three-part test that district courts must apply when evaluating whether allegations survive a 12(b)(6) motion to dismiss. *Santiago v. Warminster Township*, 629 F.3d 121 (3d Cir. 2010). A court must: (1) identify the elements of the claim; (2) review the complaint to strike conclusory allegations; and (3) look at the well-pleaded components of the complaint and evaluate "whether all the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). If the complaint fails to do so, the motion to dismiss will be granted.

### III.     DISCUSSION

### A.  Counts One, Three, and Four are Dismissed Because Plaintiff's Restrictive Covenant Provisions Lacked New and Valuable Consideration

Plaintiff brings Counts One, Three, and Four[6] against Defendant Halvorsen asserting various violations of restrictive covenants in his Employment and Confidentiality Agreements. *See* Pl.'s Compl. The agreements contained non-competition, non-solicitation, and confidentially provisions that lay the basis for these claims.

"Under Pennsylvania Law a contract is formed when the parties (1) reach a mutual understanding, (2) exchange consideration, and (3) delineate the terms of the bargain with sufficient clarity." *Tuff Wrap Installations Inc. v. Cleanwrap, Inc.*, No. 11-2576, 2011 WL 2622676, at *6 (E.D. Pa. June 29, 2011) (citing *Weavertown Transport Leasing, Inc. v. Moran*, 834 A.2d 1169, 1172 (Pa. Super. 2003)). A "'restrictive covenant entered into subsequent to the commencement of the employee's service . . . must be supported by new consideration, which can be in the form of a corresponding benefit or a beneficial change in employment status.'" *Federated Sec. Corp. v. Connor*, No. 05-372, 2005 WL 8174583, at *7 (W.D. Pa. Oct. 17, 2005) (quoting *Insulation Corp. of America v. Brobston*, 4446 Pa. Super. 530, 667 A.2d 729, 733 (Pa. Super. 1995)). To establish a breach of contract claim, the plaintiff must plead "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and[] (3) resultant damages." *Meyer, Darragh, Bucker, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.,* 792 A.2d 1269, 1272 (Pa. Super. 2002)).

Pennsylvania law, however, generally disfavors restrictive covenants in the employment context and are only valid and enforceable if certain requirements are satisfied. *Socko v. Mid-*

---

[6] Breach of the employment agreement, promissory estoppel, and breach of fiduciary duty.

*Atlantic Sys. of CPA, Inc.*, 126 A.3d 1266, 1275 (Pa. 2015). Among such requirements, "consideration is crucial, whether the covenant is entered into prior to, during, or after employment ends." *Id*. "If a noncompetition clause [or restrictive covenant] is executed at the inception of the employment, the consideration . . . may be the award of the position itself." *Id*. at 1275.

In cases of post-employment covenants, like the one at issue here, they are enforceable "only if the employee receives 'new' and valuable consideration – that is, some corresponding benefits or favorable change in employment status." *Socko,* 126 A.3d at 1275 (quoting *Pulse Techs., Inc. v. Notaro*, 620 Pa. 322, 67 A.3d 778, 781-82 (Pa. 2013)); *see also Allied Orthopedic Assocs., Inc. v. Leonetti*, No. 18-1566, 2018 WL 405801, at *6 (E.D. Pa. Aug. 24, 2018) (the District Court noted that, under Pennsylvania law, post-employment restrictive covenants require new consideration). However, "the mere continuation oof the employment relationship at the time of entering into the restrictive covenant is insufficient to serve as consideration for the new covenant." *Socko*, 126 A.3d at 1275.

Applying the principles above, Plaintiff has failed to plausibly plead that Halvorsen received new and valuable consideration for the three provisions. First, in the context of the Confidentiality Agreement, the text does not support the argument that there was new condition. Pl.'s Compl., Ex. B, Halvorsen's 2018 Confidentiality Agreement at ¶ 1. The Confidentiality Agreement specifically states that Defendant is to enter into this agreement "in consideration of his continued employment with the Company." *Id*. As discussed, continued employment is insufficient consideration.

Second, the Employment Agreement, which contains the non-disclosure and non-solicitation provisions, does not mention whether there was new consideration. Notably,

Plaintiff's Complaint is glaringly silent on the issue of whether APS issued new consideration or not.

Plaintiff contends that not only did Halvorsen himself propose and draft the Employment Agreement, but he also received consideration when key employees signed the Agreement as well. Pls.' Resp. at 13. Because of the employees signing the Employment Agreement, Plaintiffs assert that Defendant received consideration when the employees promised not to harm the other shareholders' interest upon their departure. *Id*. Plaintiff's arguments must fail. The Pennsylvania Supreme Court has held that sufficient new and valuable consideration has been found to include "a promotion, a change from part-time to fulltime employment, or even a change to a compensation package of bonuses, insurance and severance benefit." *Socko*, 126 A.3d at 1275. "More specifically, the mere continuation of the employment relationship at the time of entering into the restrictive covenant is insufficient to serve as consideration for the new covenant, despite it being an at-will relationship terminable by either party." *Id*. Thus, without new, tangible benefits to Defendant such as the ones listed above, Plaintiff cannot show that Defendant received new and considerable consideration to make the restrictive covenants enforceable. Thus, Counts One, Three, and Four are **DISMISSED**.

Since these claims are dismissed, this Court need not examine whether the agreements and provisions are unconstitutionally overbroad.

### B. Plaintiff Sufficiently Plead Facts to Support Its Claims

Defendants argue that APS has failed to identify any confidential information that has been misappropriated. Defs.' Br. at 13.

To establish a claim under the DTSA, a plaintiff must show that: (1) they own a trade secret; and (2) defendant misappropriated it. *See Teva Pharms. USA, Inc. v. Sandhu*, 291 F.

Supp. 3d 659, 674 (E.D. Pa. 2018). To determine whether something is a trade secret under

either the DTSA and the PUTSA, direct courts must consider:

> (1) The extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010). Pennsylvania courts

have recognized that trade secrets "may consist of any formula, pattern, device or compilation of

information…" *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1255 (3d Cir. 1985) (citation

omitted).

A plaintiff must identify the trade secret with enough particularity "as to separate the

trade secret from matters of general knowledge in the trade or of special knowledge of persons

skilled in the trade." *See Advanced Fluid Sys., Inc. v. Huber*, 381 F. Supp. 3d 362, 386 (M.D. Pa.

2019) (citation omitted). "[V]ague references to products and information will not suffice." *Id*.

"A plaintiff must identify its trade secrets 'with a reasonable degree of precision and

specificity'…" *Arconic Inc. v. Novelis Inc.*, 2020 WL 7247112, at *12 (W.D. Pa. Dec. 9, 2020)

(citation omitted).

Plaintiffs must not only allege the existence of a trade secret, but also that it was

misappropriated. The misappropriation standard is identical under both DTSA and PUSTA. *See*

18 U.S.C. § 1839(5)(B); 12 Pa. C. S. § 5302(2). Both statutes define misappropriation as

including the "disclosure or use of a trade secret of another without express or implied

consent…" 18 U.S.C. § 1839(5)(B); *see also* 12 Pa. C. S. § 5302(2). To show "use" of a trade

secret, a plaintiff must show that the defendant took "advantage of trade secret information to obtain an economic benefit, competitive advantage, or other commercial value, or to accomplish a similar exploitative purpose, such as 'assist[ing] or accelerat[ing] research or development.'" *See Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 910 (3d Cir. 2021) (quoting *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450-51 (3d Cir. 2007)).

A claim for misappropriation of trade secrets need not be pleaded with particularity *Etimine USA Inc. v. Yazici*, No. 20-713, 2021 WL 1131256, at *5 (W.D. Pa. Mar. 24, 2021) (citing *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, 07-1029, 2007 WL 4394447, at *8 (W.D. Pa. Dec. 13, 2007) (finding plaintiff's complaint sufficient to overcome a Rule 12(b)(6) motion to dismiss))). "Moreover, whether a plaintiff has taken sufficient measures to protect its trade secrets is a question of fact more appropriately determined with a fully developed record." *Id*. (citing *Ctr. Pointe Sleep Assocs., LLC v. Panian*, No. 09-1167, 2009 WL 789979, at *3 *W.D. Pa. Mar. 18, 2009)).

Finally, courts in this district have routinely found that the DTSA and PUTSA protect customer lists, pricing, marketing strategies and financial projections. *See, e.g.*, *Mallet & Co. v. Lacayo*, 19-1409, 2020 WL 6866386, at *7 (E.D. Pa. Nov. 23, 2020) (finding DTSA and PUTSA protect formulas, customer information, certifications, supply source, internal manuals, pricing, and volume data); *Freedom Med. Inc. v. Whitman*, 324 F. Supp. 3d 509, 522 (E.D. Pa. 2018) (pricing information); *BIEC Intern., Inc. v. Global Steel Servs.*, 791 F. Supp. 489, 544–46 (E.D. Pa. 1992) (customer lists, cost and price plans, marketing strategies, financial projections, and terms of customer accounts).

Here, Plaintiff has sufficiently plead facts to support its claims. First, APS plead that its proprietary and trade secret information, established through years of providing financial

services to individuals who worked in the pharmaceutical industry, included: (1) client lists, that contained their needs and preferences; (2) proprietary software that was developed over 25 years; and (3) a curated compilation binder of benefits available to Merck employees and retirees. Based on the case law above regarding protecting customer information, internal manuals, and formulas that took years to develop, this Court finds that Plaintiff sufficiently plead facts for a claim of trade secret misappropriation. Plaintiff's Complaint stresses that it took over 25 years to develop its proprietary software. Moreover, Merck employee benefits and APS' clients are not general or public knowledge that is readily available to everyone.

Second, APS plead that it took extensive steps to keep this information secret because allowing competitors access to the confidential information would harm APS. The Complaint pleads that APS protected these secrets through computer security, password protections, and firewalls as well as procedures for transmitting and storing information. Pl.'s Compl. at ¶¶ 9, 114, 122.

Third, Plaintiff sufficiently alleges facts regarding its steps to protect its secrets and products. The Complaint pleads that within the first three weeks following Halvorsen's resignations, Defendants were able to solicit APS clients, transferring $145 million of client assets and $996,000 of annualized client fees. Pl.'s Compl. at ¶ 47. This fact shows that Plaintiff suffered economic damages. Thus, Plaintiff has sufficiently plead five of the six factors that the Third Circuit has prescribed. *Bimbo Bakeries USA, Inc.*, 613 F.3d at 109 (3d Cir. 2010).

Fourth, Plaintiff has sufficiently plead that its trade secret is related to a product or service used in interstate commerce. Plaintiff's Complaint alleges that its "operations support persons that service nearly three hundred client households across more than twenty states." Pl.'s Compl. at ¶ 1. That is sufficient to connect Plaintiff's trade secret with interstate commerce.

Finally, Plaintiff has sufficiently plead misappropriation of trade secrets. The Complaint alleges that three weeks after Defendant Halvorsen left, Plaintiff lost $145 million of client assets and $996,000 of annualized client fees to Defendants. Pl.'s Compl. at ¶ 47. Additionally, Plaintiff pleads that 33 of its clients, with more than $175 million of assets, transferred their business from APS to Defendants because of the trade secrets they used reducing APS' annual revenue by more than $1.1 million. Because Plaintiff has sufficiently satisfied the *Twombly* standard, Defendants' Motion is **DENIED**.

### C.  Action to Stay in Federal Court

Defendants argues that Plaintiff already sued them in state court and that APS should not be heard on identical state law claims here. Defs.' Br. at 25. MRK asserts the doctrine of *lis pendens*, pendency of a prior action, and Pennsylvania Rule of Civil Procedure 1020(d) to bar this suit. *Id*. at 25-26. This Court disagrees.

Under Pa. R. Civ. P. 1020(d)(1)&(4), all claims arising from the same set of operative facts must be brought in a single suit and failure to do so ordinarily will result in waiver. *Hineline v. Stroudsburg Elec. Supply Co.*, 586 A.2d 455, 456, *appeal denied*, 528 Pa. 630, 598 A.2d 284 (1991). This Rule, however, is grounded in traditional *res judicata* principles; it bars assertion of a new claim in a separate action only if a final judgment was entered in the parallel action. *See Rycoline Products, Inc. v. C & W Unlimited*, 109 F.3d 883, 887 (3d Cir. 1997). Moreover, the Supreme Court has recognized that the pendency of a case in state court will not bar a federal court from adjudicating the same issues. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-20 (1976); *see also Ryan v. Johnson*, 115 F.3d 193, 195 (3d Cir. 1997).

Here, there has not been a final judgment in the state court proceedings against MRK. Moreover, Plaintiff's sole claim against MRK in state court is tortious interference with a business relation with Bates. Halvorsen is not a party in the state court action. More importantly, the two cases allegedly arise out of different transactions, different occurrences as to different parties, and seeks different relief. The outcome of the state court action will not resolve the nine claims Plaintiff presents here. Thus, Defendants' Motion is **DENIED**.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion is **GRANTED IN PART and DENIED IN PART**.

Counts One, Three and Four are **DISMISSED WITH PREJUDICE**. The rest of Plaintiff's Complaint remains.

**BY THE COURT:**

**/s/ Petrese B. Tucker**

**Hon. Petrese B. Tucker, U.S.D.J.**